UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

MARIANNE GATES, individually and on          :
behalf of all others similarly situated,     :
                                             :
                          Plaintiff,         :
                                             :
              -v-                            :        11-cv-3487 (KBF)
                                             :
UNITED HEALTHCARE INSURANCE           :        OPINION & ORDER
COMPANY; ALLIANCEBERNSTEIN L.P.;      :
LIFE, AD&D, DISABILITY & MEDICAL      :
PLAN FOR EMPLOYEES OF                 :
ALLIANCEBERNSTEIN L.P.; UNITED        :
HEALTHCARE CHOICE PLUS COPAY          :
PLAN FOR ALLIANCEBERNSTEIN L.P.;      :
ALLIANCEBERNSTEIN L.P. RETIREE        :
MEDICAL PLAN FOR EMPLOYEES OF         :
ALLIANCEBERNSTEIN L.P.; and           :
ALLIANCEBERNSTEIN L.P. UNITED         :
HEALTHCARE INDEMNITY PLAN,            :
                                             :
                          Defendants. :
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

This ERISA action was originally commenced in May 2011.  Now, more than

three years later, and one trip up to the Circuit and back, this Court again has

before it motions by defendants for summary judgment or dismissal as to all

remaining claims.[1]  For the reasons set forth below, those motions are GRANTED in

part and DENIED in part.

---

[1] There are five claims remaining in this lawsuit.  United Healthcare Insurance Company ("UHIC")
is a defendant in the Second and Fourth Claims for Relief; all of the remaining above-captioned
defendants (collectively referred to as the "AB defendants") are named in the First, Third, and Fifth
Claims for Relief.

I.    BACKGROUND

Marianne Gates ("plaintiff" or "Gates") and the members of the classes that she seeks to represent, were or are participants in and/or beneficiaries of employee health care plans sponsored by private companies, including AllianceBernstein L.P. ("AB"), and partially or fully administered and/or insured by defendant United Healthcare Insurance Company ("UHIC"). (Second Amended Class Action Complaint ("SAC") ¶ 2, ECF No. 75.) Plaintiff Gates is a retired employee of AB and a participant in the Life, AD&D, Disability & Medical Plan for Employees of AllianceBernstein L.P., the AllianceBernstein L.P. Retiree Plan for Employees of AllianceBernstein L.P., and the AllianceBernstein L.P. United Healthcare Indemnity Plan (together, the "Other AB Plans"). (Id. ¶ 9.) She was formerly a participant in the United Healthcare Choice Plus Copay Plan ("Copay Plan" or "Plan"). (See id. ¶ 41.) UHIC's calculation of benefits and claims procedures under the Copay Plan are at the heart of this suit.[2]

A.    Plaintiff's Claims

Gates has, in her personal capacity and as a representative of putative classes, sued UHIC as Claims Administrator of the Copay Plan, AB as the Sponsor and Plan Administrator of the Copay Plan, and the Copay Plan itself. (See SAC ¶¶ 11-12, 15, 17.) Plaintiff has asserted a series of claims relating to benefits for medical services she received between July 12, 2010 and February 24, 2011. (See

---

[2] While Gates' First and Third Claims for Relief are broadly alleged against "all Defendants other than UHIC" (First Claim for Relief) and "AllianceBernstein Plans" (Third Claim for Relief), there is no evidence in the record of any violations as to the Other AB Plans.

id. ¶¶ 57-65.) The SAC asserts seven claims for relief, of which only five remain. Two of those claims (the Second and Fourth) are asserted against UHIC; the rest of the claims (the First, Third and Fifth) are asserted against various AB defendants. There is a fair amount of confusion in the papers and even at oral argument as to what is in fact alleged in each claim for relief and what the available remedy would or could be if a violation were proven. The pleading itself—always a good place to start—defines the remaining five claims as follows:

> 1.  First Claim for Relief (against AB defendants): to recover benefits pursuant to § 502(a)(1)(B) and for injunctive relief pursuant to § 502(a)(3); that claim includes an assertion of a breach of fiduciary duty for use of the Estimating Policy[3];
>
> 2.  Second Claim for Relief (against UHIC): for injunctive relief pursuant to § 502(a)(3) to bar UHIC's continued use of the Estimating Policy[4];
>
> 3.  Third Claim for Relief (against AB Plans[5]): for relief pursuant to §§ 502(a)(3) and 503 for breach of fiduciary duty for failure to comply with appropriate claims procedure;
>
> 4.  Fourth Claim for Relief (against UHIC "derivatively on behalf of" the Plans for which UHIC serves as Claims Administrator): for relief pursuant to §§ 409(a), 502(a)(2), and 502(a)(3) for breach of fiduciary duty for failure to comply with appropriate claims procedure;
>
> 5.  Fifth Claim for Relief (against AB): for relief pursuant to §§ 409(a) and 502(a)(2) for breach of fiduciary duty for failure to terminate UHIC as Claims Administrator and failure to prudently select and monitor the Claims Administrator.[6]

---

[3] Plaintiff does not appear to be pursuing the portion of her First Claim relating to injunctive relief or breach of fiduciary duties.

[4] This claim is concerned with UHIC's use of the Estimating Policy with regard to both the Copay Plan as well as other plans administered by UHIC.

[5] The Court uses the "AB Plans" or "Plans" to refer to "AllianceBernstein Plans" as defined in the SAC.  (See SAC ¶¶ 20, 25.)

[6] Plaintiff's Sixth and Seventh claims for Relief were previously dismissed.

Gates' claims may be grouped into three categories: benefits claims (First and Second Claims for Relief), procedural claims (Third and Fourth Claims for Relief), and a monitoring claim (Fifth Claim for Relief).

B.   The Parties' Arguments

1.   First and Second Claims

The First and Second Claims for Relief are at the heart of this lawsuit.  They seek monetary damages and injunctive relief in connection with Gates' assertion that she has not been paid the full benefits she is owed.  Plaintiff claims that UHIC applied an erroneous methodology to its calculation of her benefits.  The First Claim for Relief references both monetary and prospective injunctive relief against the AB defendants but the parties have argued it as if it is limited to monetary relief.[7]  The Second Claim for Relief seeks only prospective injunctive relief against UHIC.

The parties' main dispute as to these claims relates to whether the terms of the Summary Plan Description ("SPD") which lay out the coordination of benefits ("COB") methodology are ambiguous in whole or in part, thereby allowing for interpretation by UHIC and application of the arbitrary-and-capricious standard to such interpretation.  Plaintiff asserts that the terms are unambiguous in whole, requiring literal application and permitting no exercise of interpretative discretion by UHIC.  Defendants argue the opposite.  The answer to the question of ambiguity determines the outcome of defendants' motion as to the First Claim.  As to the Second Claim, even if the language is unambiguous, there is a further question as

---

[7] This may be due to the fact that UHIC is not a defendant in that claim and it is conceded that it is UHIC, as the Claims Administrator, that applies the COB methodology to claims for benefits.

to whether injunctive relief is an available remedy.  Plaintiff argues that even though she is no longer a participant in the Copay Plan, injunctive relief remains available because she seeks to represent a class some of whose members may still be participants.[8]  Defendants argue that plaintiff's ability to seek injunctive relief ended when she ceased to be a participant in the Copay Plan.

### 2.    Third and Fourth Claims

Plaintiff's Third and Fourth Claims for Relief relate to the same alleged concern that UHIC (not named as a defendant in the Third Claim) has breached its fiduciary duties by failing to comply with the appropriate claims procedure as established by the Copay Plan. The Third Claim is asserted against the AB Plans only.  The Fourth Claim is asserted against UHIC only.

Neither claim is a model of clarity.  However, at bottom, the language of the claims includes sufficient references to be construed as alleging violations of ERISA § 503 relating to claims procedures, as well as breaches of fiduciary duty under § 404 for the § 503 violations. In addition, however, the Fourth Claim for Relief asserts a claim pursuant to § 502(a)(2) for relief under § 409—which relates to a loss in Plan assets.  No such loss is in fact described or alleged.  The § 502(a)(2) and accompanying § 409 claims are irrelevant to the facts alleged in the SAC or in the record on this motion.[9]

---

[8] Plaintiff has proffered no evidence regarding any participant other than herself; continued participation by others is therefore asserted but lacks evidentiary support.

[9] Defendants spend a fair amount of time briefing the § 502(a)(2)/§ 409 issue. They argue correctly that this sort of claim cannot withstand scrutiny in the context of the SAC and the factual record on this motion. However, they incorrectly extend this argument more generally to plaintiff's separate § 503 claim.  ERISA does provide relief for demonstrated violations of § 503 and, as a matter of law, there is no necessary connection between plaintiff's § 503 and § 502(a)(2)/§ 409 claims.

The Third Claim for Relief is against the Plan[10] only, not UHIC.  It seeks relief for violations of claims procedure requirements established in § 503, alleging that such violations are breaches of fiduciary duties.  Plaintiff seeks generalized injunctive relief under § 502(a)(3) for such violations.  Threshold issues with this claim are that (1) it does not name UHIC as a defendant and instead seeks to hold the Plan, concededly not itself a fiduciary, liable for UHIC's breaches of § 503 and UHIC's breaches of fiduciary duties and (2) seeks prospective injunctive relief when plaintiff is concededly no longer a participant in the Plan.

The AB defendants seek judgment on this claim on several grounds: first, on the ground that the claim is asserted against, not on behalf of, the Plan, and the Plan is not a fiduciary; second, on the ground that a failure to comply with claims procedures required by § 503 cannot constitute a § 404 breach of fiduciary duty; third, on the ground that plaintiff may only seek to establish a breach of fiduciary duty under § 502(a)(2), not under § 502(a)(3); and finally, on the ground that, in any event, remedies for violations of § 503 are administrative only and injunctive relief is not available.

Plaintiff counters by explaining that her Third Claim is based on § 503's requirement that all participants are entitled to some measure of due process in connection with claims for benefits, and that she did not receive such process.  In this regard, she asserts that it is irrelevant that she has named only the Plan as

---

[10] As noted above, while the Third Claim is asserted against "AllianceBernstein Plans" (plural), not just the Copay Plan, there is no evidence in the record of any violations of claims procedure as to any plan other than the Copay Plan.

defendant in this claim since it is clear on the face of her claim that she is alleging a breach of fiduciary duty by UHIC. She concedes that the Plan is not a fiduciary; rather, she asserts that the Plan is bound by the requirements of § 503. Plaintiff argues that she can allege a violation of § 503 and seek relief under § 502(a)(3) without resort to a claim based on a breach of fiduciary duty. In terms of injunctive relief, plaintiff argues that she has an existing claim—unaffected by the fact that she is no longer a participant in the Copay Plan—for a full and fair review of her claim.

The Fourth Claim for Relief, alleged only against UHIC, alleges a violation of § 502(a)(2), with § 409 as its remedy. Only secondarily does it reference § 502(a)(3). Defendant UHIC argues that §§ 502(a)(2) and 409 are inapplicable in this case. It then turns to the portion of the Fourth Claim which seeks to invoke more general remedial relief under § 502(a)(3)—a provision not tied to a loss or misuse of plan assets.

UHIC argues that in order to seek relief under § 502(a)(3), plaintiff must show an underlying violation of ERISA. UHIC argues that plaintiff has not alleged a cognizable violation. But while the Fourth Claim for Relief does not specifically reference § 503, it plainly alleges a violation of § 503. That section is the substantive portion of ERISA requiring establishment and compliance with certain claims procedures.

UHIC additionally argues that § 503 claims are limited to claims against employee benefit plans, and that UHIC is a Claims Administrator, not a plan. This

is where plaintiff's additional assertions in the Fourth Claim with regard to UHIC's breach of fiduciary duty come into play. According to plaintiff, as Claims Administrator, UHIC was tasked with complying with § 503, and this it failed to do, thereby breaching its fiduciary duties. In short, while the Fourth Claim for Relief does state a claim under ERISA, it does so under a combination of §§ 502(a)(3), 503, and 404—not §§ 502(a)(2) and 409.

Defendants also argue that, in all events, the remedies available for a § 503 violation are administrative only, including deemed administrative exhaustion or remand. But this ignores that a breach of fiduciary duty may be addressed more generally under § 502(a)(3), which plaintiff asserts with regard to this claim.

### 3. Fifth Claim for Relief

The Fifth Claim for Relief is asserted against AB and seeks to hold it liable for failing adequately to monitor and terminate UHIC. This claim alleges violations of §§ 502(a)(2) and 409. It does not seek relief under any other provision of ERISA.

The AB defendants argue, as they have elsewhere, that §§ 502(a)(2) and 409 are inapplicable to the facts as alleged. In addition, they argue that the claim is really one for liability for breach of a co-fiduciary's duties pursuant to § 405. Plaintiff did not plead § 405. That provision requires (1) knowingly participating in or concealing of an act or omission of another fiduciary, knowing that such act or omission was a breach of fiduciary duty; or (2) enabling another fiduciary to commit a breach through failure to comply with § 404; or (3) knowing that another fiduciary has committed a breach and failing to take remedial steps. See 29 U.S.C. § 1105

[ERISA § 405]. According to defendants, since such a claim requires an underlying breach by UHIC, and since such a breach cannot be established, the claim must fail. In the event that a breach by UHIC is shown, this argument fails. Plaintiff counters that the basis for this claim is UHIC's breach of fiduciary duty. She also asserts that the Fifth Claim is not a "derivative" claim, though it uses that word; rather, that term is used to refer to plaintiff's role as a representative of a class. According to plaintiff, her representative capacity keeps her claim alive despite her own lack of continuing participation in the Copay Plan.

    C.    The SPD and the Parties' Interpretations

The terms of the Copay Plan are set forth in the Plan Document and the SPD. (See SPD, Smith Decl., Exh. A, ECF No. 81.) The Introduction to the SPD states that it "describes your Benefits, as well as your rights and responsibilities, under the Plan." (SPD at 1.) It provides for submission of claims as well as requests for reviews of denied claims and complaints to be made directly by the participant to UHIC. (Id. at 2.)

The SPD provides that AB has "delegated to the Claims Administrator [UHIC] the exclusive right to interpret and administer the provisions of the Plan. The Claim Administrator's decisions are conclusive and binding." (SPD at 65.) The SPD further provides that AB and UHIC have the "sole and exclusive discretion" to "[i]nterpret Benefits under the Plan," "[i]nterpret the other terms, conditions, limitations and exclusions of the Plan, including this SPD," and "[m]ake factual determinations related to the Plan and its Benefits." (Id. at 81.) Finally, the SPD

states that AB and UHIC may each "delegate this discretionary authority to other persons or entities who provide services in regard to the administration of the Plan." (Id. at 82.)

To determine benefits under the Copay Plan requires reference to a number of different provisions contained within Section 7 of the SPD, entitled "Coordination of Benefits." All of Section 7 is concerned in one way or another with instances in which more than one "Coverage Plan" may apply, and how benefits are determined in such a situation. It starts by defining "When Coordination of Benefits Applies." It states, "This coordination of benefits (COB) provision applies when a person has health care coverage under more than one benefit plan." (SPD at 66.) It then informs the reader that:

> The order of benefit determination rules described in this section determine which Coverage Plan will pay as the Primary Coverage Plan. The Primary Coverage Plan that pays first pays without regard to the possibility that another Coverage Plan may cover some expenses. A Secondary Coverage Plan pays after the Primary Coverage Plan and may reduce the benefits it pays.

(Id.) Definitions applicable to the coordination of benefits determination follow. The definition of "Coverage Plan" provides that both the Copay Plan itself and, inter alia, Medicare fall within its ambit. (Id.) The Definitions section also states:

> When this Coverage Plan is primary, its benefits are determined before those of any other Coverage Plan and without considering any other Coverage Plan's benefits. When this Coverage Plan is secondary, its benefits are determined after those of another Coverage Plan and may be reduced because of the Primary Coverage Plan's benefits.

(Id. at 67.)[11]  Section 7 has a subsection entitled "Order of Benefit Determination Rules."  (Id. at 68.)  It provides, "When two or more Coverage Plans pay benefits, the rules for determining the order of payment are as follows: A. The Primary Coverage Plan pays or provides its benefits as if the Secondary Coverage Plan or Coverage Plans did not exist."  (Id.)  On the same page, it provides that if a person is retired, then Medicare is primary and the other Coverage Plan covering the person as a retiree is secondary.  (See id. ¶1.)

Plaintiff Gates is undisputedly retired from AB.  It is also undisputed that for purposes of applying the COB methodology, Medicare is her Primary Coverage Plan and the Copay Plan is secondary. As plaintiff is covered under two plans, one turns to the next subsection, entitled "Effect on the Benefits of this Plan."  (SPD at 69.) That subsection provides the methodology for benefit payments in such a situation. It states, first, that "[w]hen this [that is, the Copay Plan] is secondary, it may reduce its benefits by the total amount of benefits paid or provided by all Coverage Plans Primary to this Coverage Plan."  (Id.)  With regard to a determination as to each claim submitted, the Copay Plan will:

---

[11] Defendants argue that example "d." in the Definitions section regarding "Allowable Expense" supports their position on the proper interpretation of the COB methodology.  That example states:

> d. If a person is covered by one Coverage Plan that calculates its benefits or services on the basis of usual and customary fees and another Coverage Plan that provides its benefits or services on the basis of negotiated fees, the Primary Coverage Plan's payment arrangements shall be the Allowable Expense for all Coverage Plans.

(SPD at 67.)  The parties do not dispute that this example is not on all fours with the facts before this Court as Medicare does not, strictly speaking, "negotiate its fees" with any particular provider. This example is inapplicable; it requires interpretation in what this Court finds to be otherwise unambiguous language.

> 1. Determine its obligation to pay or provide benefits under its contract. [That is, determine whether it is a primary or secondary Coverage Plan];
>
> 2. Determine the difference between the benefit payments that this Coverage Plan would have paid had it been the Primary Coverage Plan and the benefit payments paid or provided by all Coverage Plans Primary to this Coverage Plan.
>
> If there is a difference, this Coverage Plan [the Copay Plan] will pay that amount. Benefits paid or provided by this Coverage Plan plus those of Coverage Plans primary to this Coverage Plan may be less than 100 percent of total Allowable Expense.

(Id.)  In the next relevant step, the SPD provides:

> This Coverage Plan reduces its benefits as described below for Covered Persons who are eligible for Medicare when Medicare would be the Primary Coverage Plan.
>
> Medicare benefits are determined as if the full amount that would have been payable under Medicare was actually paid under Medicare, even if:
> . . .
> -   The person receives services from a provider who has elected to opt-out of Medicare. Medicare benefits are determined as if the services were covered under Medicare Parts A and B and the provider had agreed to limit charges to the amount of charges allowed under Medicare rules.

(Id. at 70.)

Plaintiff alleges that the above-quoted language sets forth a clear methodology for determining benefits when, as was the case with her, a participant is retired, Medicare eligible, and receives services from a provider who has elected to opt out of Medicare. First, the Plan must determine the payments that the Plan would have paid had it been the Primary Coverage Plan. Relying on the definition of when a Coverage Plan is primary, plaintiff argues that the Plan must use the

methodology that it would have used if it were primary without considering
Medicare's benefits.  The parties do not dispute that in such instances UHIC applies
a reimbursement percentage defined in the Copay Plan to the usual and customary
rate ("UCR") for the procedure at issue.  UHIC obtains the usual and customary
rate from a database UHIC rents from Fair Health, Inc.

The Plan must then determine the amount that Medicare would have paid
had the provider not opted out.  Finally, the Plan must deduct the amount that
Medicare would have paid (as if it had been paid) from the amount that the Copay
Plan would pay.  The key language for this step is quoted above and included here
for ease of reference:

> Determine the difference between the benefit payments that this
> Coverage Plan would have paid had it been the Primary Coverage Plan
> and the benefit payments paid or provided by all Coverage Plans
> Primary to this Coverage Plan.  If there is a difference, this Coverage
> Plan [the Copay Plan] will pay that amount.

(SPD at 69.)  According to plaintiff, the formula would work as follows in practice:

1.  Plaintiff obtains procedure X.

2.  Plaintiff pays out of pocket the amount A [e.g., $400], which
    constitutes the provider's fee.

3.  If plaintiff were eligible for Medicare and the provider had not
    opted out of Medicare, Medicare would pay an amount B for
    procedure X, where B is the rate from the applicable Medicare
    schedule (e.g., $57.87) multiplied by Medicare's reimbursement
    percentage (80%).  [$57.87 x 80% = $47.10]

4.  The Copay Plan should assume that plaintiff would have been
    paid the amount B.

5.  The Copay Plan determines its usual and customary rate for
    procedure X [e.g., $350], reduced by its reimbursement

percentage [e.g., 70%]; this constitutes an amount C.  [$350 x 70% = $245]

6.   The difference between B and C is the amount of benefits payable.  [$245 – $47.10 = $197.90]

(See Plaintiff's Memorandum of Law in Opposition to the AB Defendants' Motion for Summary Judgment ("Pl.'s AB Opp.") at 5, ECF No. 135.)

Defendants disagree with this methodology.  According to defendants, the key to the difference lies in a portion of the methodology plaintiff spends little time on—determination of the "Allowable Expense."  Defendants assert that the term "Allowable Expense" is quantitative in that it allows UHIC to determine a particular dollar amount to plug into its calculation; according to plaintiff, "Allowable Expense" is qualitative—it is a determination as to whether a particular expense is "allowable," not necessarily the amount.  Put another way, plaintiff argues that "Allowable Expense" refers to whether the expense is allowed; defendants argue that it refers to the dollar amount of such expense, that is, the "amount" allowed.

According to defendants, the "Allowable Expense" is used twice in the calculation of benefits—first, as the "full amount that would have been payable under Medicare" and, second, as the monetary amount used to calculate what the Copay Plan "would have paid had it been the Primary Coverage Plan."  According to defendants, when a participant uses a provider who has opted out of Medicare, it is reasonable to use the same Allowable Expense—defined as the amount the participant paid to the opt-out provider—in both the first and second step of the

14

equation; otherwise, there would be one <u>amount</u> for the Allowable Expense under Medicare and a second <u>different amount</u> Allowable Expense for the same procedure under the Copay's own usual and customary rates.  Defendants argue that using the amount actually paid to the opt-out provider in both instances eliminates the need for this difference.

According to defendants, and as implemented in connection with plaintiff's claims here, the formula is as follows:

1. Plaintiff obtains procedure X.

2. Plaintiff pays out of pocket the amount A [<u>e.g.</u>, $400] for such procedure, which constitutes the "Allowable Expense."

3. UHIC interprets the Plan to provide that Medicare would pay as 80% of A—the fee in fact charged by the provider.  This becomes amount B.  [$400 x 80% = $320]

4. The Copay Plan does not refer to usual and customary rates for Procedure X but instead uses the same Allowable Expense as that referred to above to determine the amount the Plan "would have paid" plaintiff if it had been her "Primary Coverage Plan." This becomes amount C.  [$400 x 100% = $400]

5. Finally, UHIC subtracts the "full amount that would have been payable under Medicare" from the figure it found for the amount the Plan "would have paid had it been the Primary Coverage Plan" to determine benefits owed.  [$400 – $320 = $80]

(Pl.'s AB Opp. at 6.)  Thus, using plaintiff's formula, her benefits for Procedure X should have been $197.90; using defendants' formula, those benefits would instead be $80.

For the reasons set forth below, the Court finds that (1) the COB methodology is unambiguous; (2) that injunctive relief is not available for past

violations under § 502(a)(1) or § 502(a)(3)—for either benefits determinations or claims procedures. And finally, while plaintiff might be able to state a claim against AB for co-fiduciary liability, the only relief sought for such violation is injunctive relief, which is unavailable to plaintiff or otherwise procedurally nonsensical. Accordingly, defendants' motion is DENIED as to the First Claim for Relief and GRANTED as to all other claims.

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard[12]

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citation omitted).

---

[12] The instant motions are brought by UHIC under both Rules 12 and 56 of the Federal Rules of Civil Procedure; the AB defendants have moved only under Rule 56. The briefing and argument have been concerned largely (though not exclusively) with whether summary judgment is appropriate. Under both Rules 12 and 56, inferences are drawn in favor of plaintiff. Under Rule 12, facts as asserted in the SAC are assumed true; under Rule 56, plaintiff must raise a triable issue of fact. The Court here applies a Rule 56 standard, but, in any event, the facts which matter are set forth in the SAC. (For instance, that plaintiff is no longer a participant in the Copay Plan.) If any party believes that the standard of review used was erroneous and would have impacted the outcome, they should raise that issue with the Court immediately under Local Rule 6.3.

When a summary judgment motion is properly supported by documents or other evidentiary materials, the opposing party must set out specific facts showing a genuine issue for trial, and cannot rely merely on allegations or denials contained in the pleadings. See Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks omitted). In addition, self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. See BellSouth Telecomms. Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996).

B.   ERISA Statute and Legal Principles

ERISA was passed in 1974 to:

> Protect . . . participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b) [ERISA § 2(b)];[13] see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44 (1987). Health care plans are considered to be among those employee

---

[13] To add to the complexity of ERISA, every provision has, in effect, two statutory references: one is from the U.S. Code (e.g., 29 U.S.C. § 1001) and the second is the more commonly used shorthand

welfare plans comprehensively regulated by ERISA. <u>See</u> 29 U.S.C. § 1002(1)

[ERISA § 3(1)].  The terms "employee welfare benefit plan" and "welfare plan"

include "any plan" maintained for the purpose of, <u>inter alia</u>, providing participants

with medical benefits.  <u>Id.</u>  The general term "employee benefit plan" or "plan"

means "an employee welfare benefit plan or an employee pension benefit plan or a

plan which is both." <u>Id.</u> § 1002(3) [ERISA § 3(3)].  The term "participant" includes

former employees who are or may become eligible to receive a benefit under an

employee benefit plan. <u>Id.</u> § 1002(7) [ERISA § 3(7)].

A "fiduciary" is defined as one who with respect to a plan:

> (i) . . . exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority or
> control respecting management or disposition of assets, . . . or (iii) . . .
> has any discretionary authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A) [ERISA § 3(21)(A)].  Fiduciary duties are set forth in ERISA

§ 404.  That provision provides that "a fiduciary shall discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries and—"

> . . .
> (D) in accordance with the documents and instruments governing the
> plan insofar as such documents and instruments are consistent with
> the provisions of this subchapter . . . .

29 U.S.C. § 1104(a)(1)(D) [ERISA § 404(a)(1)(D)].  ERISA § 409(a) provides for

certain—but not exclusive—remedies for breach of fiduciary duties.  This section

applies when such breach has resulted in a loss of plan assets:

---

(<u>e.g.</u>, ERISA § 2).  The Court references both here, but the pleadings and submissions are written
primarily with reference to the ERISA shorthand.

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . .

29 U.S.C. § 1109(a) [ERISA § 409(a)].[14]  ERISA § 405 provides for liability for

breaches of a co-fiduciary's duties under a plan.  That section provides:

> (a) . . . In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>>
>> (2) if  . . . he has enabled such other fiduciary to commit a breach; or
>>
>> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a) [ERISA § 405(a)].  ERISA § 502 contains general provisions

regarding civil enforcement of ERISA violations.  That section provides that, inter

alia, a participant or beneficiary may bring an action:

> [(1)(B)] to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan . . .; [or]
>
> (2) . . . for appropriate relief under section 1109 [§ 409] of this title; [or] . . .

---

[14] There are numerous examples of claims for breaches of fiduciary duty under ERISA § 404 and relief under §§ 502(a)(1) and (a)(3).  See, e.g., Varity Corp. v. Howe, 516 U.S. 489, 510 (1996) ("The words of subsection (3)—'appropriate equitable relief' to 'redress' any 'act or practice which violates any provision of this title'—are broad enough to cover individual relief for breach of a fiduciary obligation.  Varity argues that the title of § 409—'Liability for Breach of Fiduciary Duty'—means that § 409 (and its companion, subsection (2)) cover all such liability.  But that is not what the title or the provision says.  And other language in the statute suggests the contrary.").

> [(3)(A)] to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a) [ERISA § 502(a)].  ERISA § 503 contains provisions relating to claims procedures.  It requires that every employee benefit plan—which, per the definition section, includes medical plans—shall:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133 [ERISA § 503].

The ERISA statute does not contain a standard of review for actions under § 1132(a)(1)(B) [ERISA § 502(a)(1)(B)] challenging benefit eligibility determinations.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).  Firestone squarely addressed the standard of review applicable in ERISA cases.  The Supreme Court recognized that since ERISA derives from trust law, a deferential standard of review is appropriate when a fiduciary is exercising discretionary authority.  Id. at 111.  "A [fiduciary] may be given power to construe disputed or doubtful terms, and in such circumstances the [fiduciary's] interpretation will not be disturbed if reasonable."[15]  Id.

---

[15] However, the fiduciary's interpretation may be disturbed if the fiduciary "impose[s] a standard not required by the plan's provisions, or interpret[s] the plan in a manner inconsistent with its plain words."  Frommert v. Conkright, 738 F.3d 522, 529-30 (2d Cir. 2013) (quoting O'Shea v. First

Another name for "disputed or doubtful" language, Firestone, 489 U.S. at 111, is ambiguous language.  "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire . . . agreement."  Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002) (quoting O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc., 37 F.3d 55, 59 (2d Cir. 1994)) (internal quotation marks omitted).  Where the plan grants the fiduciary discretionary authority to interpret (ambiguous) plan language to determine eligibility benefits, a court may only overturn the fiduciary's determination only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."  McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 132 (2d Cir. 2008) (quoting Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995)) (internal quotation marks omitted).  When there is both ambiguity and conflicting rational interpretations, the fiduciary's interpretation controls.  Id.

When terms in a plan require no construction, deference to a fiduciary is neither appropriate nor required.  Id. at 112.  In Firestone, the Supreme Court held that a deferential standard of review is appropriate only where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"; otherwise, de novo review applies.  Firestone, 489 U.S. at 115.  Based on this principle, a number of Second Circuit cases have held that when a contract is unambiguous, no discretion is exercised and

---

Manhattan Co. Thrift Plan & Trust, 55 F.3d 109, 112 (2d Cir. 1995)) (internal quotation marks omitted); see also Pochoday v. Bldg. Serv. 32B-J Pension Fund, 5 F. App'x 16, 20 (2d Cir. 2001).

therefore a de novo (and not deferential) standard of review applies. See, e.g.,

O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 59 (2d Cir.

1994) ("Where, however, plan language categorically states that certain benefits

will be provided, de novo review is appropriate because unambiguous language

leaves no room for the exercise of discretion." (citing Heidgerd v. Olin Corp., 906

F.2d 903, 908-09 (2d Cir. 1990))).

III.    DISCUSSION

      A.    First and Second Claims for Relief

            1.    The Question of Ambiguity

The threshold question for this Court is whether some or all of the claim

language used to calculate benefits for plaintiff under the Copay Plan is ambiguous.

If it is, then a deferential standard of review is appropriate and a fiduciary's

rational interpretation must control. Firestone, 482 U.S. at 111. If it is not, then

the Court must construe the language as written. See O'Neil, 37 F.3d at 59;

Heidgerd, 906 F.2d at 908-09. In its first decision in this matter—eighteen months

ago—the Court found the language ambiguous. Now it does not. It is reasonable to

wonder how the same judge, interpreting the same language, can arrive at two such

opposing views. Indeed, one may rationally ask whether the fact that a court has

arrived at such opposing views itself supports ambiguity. The reason for the

difference is, simply put, that we all make mistakes. This Court made one in its

prior decision. It is difficult for this Court, reading the language as it does now, to

imagine how it got it so wrong. Perhaps the additional experience on the bench,

reviewing SPDs and interpreting plan language in a number of cases, has added to the Court's skills in this regard. In all events, the Court does determine that the language is unambiguous.

The Court's conclusion that the language is unambiguous is based on its view that simply reading the language of the Plan provides answers each step of the way—without the need for further interpretation—as to how benefits should be calculated. The Court also agrees with plaintiff that her method of calculation reflects the clear steps the Plan requires. Marching through the terms of the Copay Plan informs the reader how to calculate the first input into the formula—the "full amount Medicare would have paid." That amount is knowable from public sources: an arm of the U.S. Department of Health and Human Services ("UHHS") puts out a fee schedule (http://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx) that provides Medicare payment amounts, depending on year, geographic region, CPT code, and other parameters—i.e., the actual Medicare payment rates. The next step requires determination of what the Copay Plan itself would have paid had it been primary. That is also a knowable number: there is an established method for calculating that amount using the usual and customary rates the Copay Plan in fact uses when it is primary. Nothing in the SPD suggests that Medicare opt-outs should be treated entirely differently from other claims using the very same language. In other words, there is nothing to suggest that the language is clear when it is applied to instances in which the Copay Plan is in fact primary but becomes ambiguous here. That defendants chose to interpret the COB

methodology in a particular way does not necessarily mean that the language needed interpretation. Finally, the plain-language interpretation is consistent with the purposes of ERISA, as set forth above.

Defendants argue that interpretation is required. In particular, they argue that the term "Allowable Expense" requires interpretation, and that it is rational to have the same "Allowable Expense" at each step of the COB calculation. If there is ambiguity, defendants also argue that various policy and procedural arguments support the rationality of their approach. But the term "Allowable Expense" is quite clear, and it does not mean what defendants assert. Nor does it play the role in the COB methodology that they assert. There is no basis for some number—which is neither an amount Medicare would have paid nor an amount the Copay Plan would have paid—to be plugged in as the "Allowable Expense."

The lack of ambiguity forecloses the interpretation defendants have proffered as a basis for summary judgment on plaintiff's First Claim for Relief. Defendants' motion as to that claim is therefore DENIED.

>    2.    Injunctive Relief

Defendants argue that even if plaintiff has a claim for damages with regard to her First Claim for Relief, she may not seek prospective injunctive relief in her Second Claim for Relief pursuant to ERISA § 502(a)(3). In that claim, plaintiff seeks to prohibit defendants from using the UHIC "Estimating Policy" in the future. The Court agrees with defendants.

Two key facts are undisputed: (1) no class has yet been certified in this action—Gates is the sole plaintiff at present; and (2) plaintiff is no longer a participant in the Copay Plan.

As a matter of law, in order to pursue the remedy of an injunction, plaintiff must be able to show that she is likely to suffer the same injury in the future. See City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983). Past exposure to illegal conduct does not permit a plaintiff to pursue injunctive relief "if unaccompanied by any continuing, present adverse effects." Id. at 102 (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)) (internal quotation mark omitted). Here, Gates has not even raised a triable issue as to likelihood of future injury or any continuing, present effects of her past injury.

On the undisputed facts, there is no real or immediate threat that the use of the Estimating Policy with regard to benefits under the Copay Plan will impact plaintiff in any way. Her individual claim for injunctive relief is therefore untenable. See N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 127 (2d Cir. 1998).

Nor does plaintiff have the ability at this stage of the case to pursue such a claim in her theoretically (not officially) representative capacity. Contrary to plaintiff's position, it is of no moment that plaintiff seeks to represent a class of others who might have some real or immediate threat of repetition that she does not share. This Court has not yet certified a class under Rule 23. Indeed, no motion for class certification has even been made. Plaintiff's representative capacity therefore

remains possible but far from actual. At this time, she represents no single person other than herself. "'There is nothing in Rule 23 which precludes the court from examining the merits of plaintiff's claims on a proper Rule 12 motion to dismiss or Rule 56 motion for summary judgment simply because such a motion' precedes resolution of the issue of class certification." Schweizer v. Trans Union Corp., 136 F.3d 233, 239 (2d Cir. 1998) (quoting Lorber v. Beebe, 407 F. Supp. 279, 291 n.11 (S.D.N.Y. 1975)); see also Christensen v. Kiewit–Murdock Inv. Corp., 815 F.2d 206, 214 (2d Cir. 1987) (finding that the district court did not err in resolving motions to dismiss a complaint prior to class certification).

Plaintiff cites NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012), as support for the proposition that she may continue to assert claims for injunctive relief in her representative capacity. Plaintiff misconstrues the facts and holding of the NECA-IBEW case.

NECA-IBEW is about justiciability—it is not an all-purpose case which somehow stands for the extraordinary proposition that a plaintiff in a not-yet-certified class action may defeat summary judgment with regard to claims in which he or she has no personal interest. Liability is always determined plaintiff by plaintiff, unless but not until, a class has been certified. There is no other rule, and NECA-IBEW does not hold otherwise. In that case, the Second Circuit reversed the district court's dismissal of a complaint; that is, the case was dismissed at the initial pleading stage. See id. at 154-56 (describing the procedural history of the case). In that context, the Second Circuit reviewed whether plaintiff had Article III and

statutory standing in his own right to bring certain claims as to offerings of securities which he had purchased, versus "class standing" to assert claims on behalf of purchasers of certificates that were backed by mortgages from same lenders that originated mortgages backing plaintiff's certificates. See id. at 148-49, 158. The Second Circuit stated that the fact that a plaintiff has a case or controversy as to himself does not necessarily mean he can litigate the interests of the class he seeks to represent. Id. at 159 (citing Sosna v. Iowa, 419 U.S. 393, 403 (1975)). Once a plaintiff has established justiciability, the question as to whether he "can" represent a class turns on a court's analysis of the Rule 23 factors; in NECA-IBEW, as here, class certification was a question for another day.

In this case, at this point in time, this Court is not faced with questions of justiciability. The Court's determination as to whether to grant or deny judgment is based on whether plaintiff has raised a triable issue as to the claim as to which judgment is sought. Here, she has not and, based on her own facts, cannot. Accordingly, while plaintiff may pursue a claim for damages, and indeed may seek certification of a class, at this time she cannot maintain her request for injunctive relief.[16]

---

[16] Defendants also assert that the holding in Varity separately precludes the imposition of injunctive relief. The Court disagrees with defendants' reading of Varity, but in any event, resolution of the debate is unnecessary to the Court's decision on the Second Claim.

B.      Third and Fourth Claims for Relief

Plaintiff's Third and Fourth Claims for Relief assert breaches of fiduciary duties with regard to claims procedures.  Plaintiff seeks administrative relief as to herself and prospective injunctive relief as to unnamed potential class members.

As a threshold matter, as set forth above with regard to the Second Claim for Relief, injunctive relief is not available to plaintiff.  She is concededly no longer a participant in the Copay Plan—she so asserts in the SAC.  (SAC ¶ 41.)  She is therefore not at risk of being harmed or impacted by any future failures with regard to claims procedures.  In the absence of available relief, her claim, insofar as it relates to such relief, must fail.  In terms of administrative relief as to which she has a live claim, remanding plaintiff's claims would serve no purpose other than that achieved if her First Claim for Relief succeeds—that is, payment for benefits. Remand and deemed exhaustion are nonsensical in the context of this case, which has been pending for several years.

The lack of a separate remedy for these claims requires their dismissal.  The Court notes, however, that it has considered the parties' additional arguments. First, the Court agrees that to the extent that either claim seeks to impose liability under §§ 502(a)(2) and 409 for failures to comply with claims procedure requirements, those sections are inapplicable.  Section 502(a)(2) invokes the § 409— which relates to a loss in plan assets.  There is no claim here of any loss in Plan assets.

The Court has analyzed plaintiff's claims under § 503 more generally, along with § 404, and in terms of relief otherwise possible under § 502(a)(3).  Section 404 generally requires all fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104 [ERISA § 404]. There is at least a triable issue of fact as to whether UHIC, in the Fourth Claim, complied with its § 404 obligations. On this basis alone, the claim could proceed if the injunctive relief sought were available.  However, for the reasons set forth above, it is not.

Defendants also seek dismissal of this claim because "the Section 503 claims administration requirements do not implicate the fiduciary duties specified in Section 404(a)(1)(D)."  (Memorandum of AB Defendants in Support of Motion for Summary Judgment at 18, ECF No. 125.)  According to defendants, claims administration duties are found in Part 5 of ERISA, entitled "Administration and Enforcement," and it is this section which sets forth statutory provisions regarding claims procedures.  Defendants point to the fact that Part 5 is distinct from Part 4 of the statute, which is entitled "Fiduciary Responsibility."  Defendants further argue that the disclosure obligations in § 404 are with regard to pension benefit plans, not welfare benefit plans—and as a health care plan, the Copay Plan is a welfare benefit plan.

This Court disagrees with these arguments.  As an initial matter, there is no triable issue of fact as to whether UHIC was a fiduciary of the Copay Plan—it plainly was.  It was delegated the responsibility for administering all claims and to

making any interpretations necessary. Here, plaintiff correctly alleges that, in connection with those administration duties, UHIC made interpretations that it should not have. The Court found, in connection with the First Claim, that the COB methodology in the Copay Plan is clear and unambiguous and that UHIC applied erroneous methodology contrary to the plain language of the Copay Plan.

It is also clear that § 404 does apply to the type of claim—and the type of employee welfare plan it is based on—here asserted. The definitions of "employee welfare benefit plan" and "plan" (as set forth above) eliminate any doubt as to that point.

With regard to the Fourth Claim, there is no reasonable doubt that UHIC was acting as a fiduciary when it made its benefit determinations. When UHIC applied its interpretation to a claim for benefits, and paid a participant accordingly, it was undertaking many functions simultaneously: an interpretive function in which it was exercising its discretion (wrongly as it turns out), as well as a bookkeeping and administrative function when it cut the check and sent it to the participant. In exercising its duties in determining whether or not to pay a claim here, it was acting as a fiduciary; when it was simply cutting the check that it had otherwise determined should be cut, it was acting in a simple ministerial capacity. This is consistent with the Supreme Court's discussion in <u>Varity</u> as to when an administrator of a plan acts a fiduciary and not.

In <u>Varity</u>, the Court found that an administrator can wear more than one hat at the same time, but that when he is carrying out an important plan purpose, he is

acting as a fiduciary.  See 516 U.S. at 502.  Moreover, a "plan administrator engages

in a fiduciary act when making a discretionary determination about whether a

claimant is entitled to benefits under the terms of the plan documents."  Id. at 511.

It cannot be that when discretion is wrongly exercised to deny benefits, such

conduct falls outside the scope of an administrator's fiduciary duties.

Defendants argue that § 503 addresses only procedural aspects of the claims

process and does not create any substantive fiduciary duties.  Defendants cite Bell

v. Pfizer, Inc., in which the Second Circuit stated:

> [A]lthough Congress intended the term "fiduciary" to be broadly
> construed, "even [this] broad construction has limits."  Falling outside
> these limits are plan employees who perform ministerial tasks with
> respect to the plan, such as the application of rules determining
> eligibility for participation, preparation of plan communication
> materials, the calculation of benefits, and the maintenance of employee
> records.  These tasks have been held not to require the exercise of
> discretionary authority and do not, therefore, implicate any fiduciary
> duty.

626 F.3d 66, 74 (2d Cir. 2010) (citations omitted).  This case is consistent, not

inconsistent, with this Court's determination.  UHIC was wearing more than one

hat at different points in the process of considering and then paying out a particular

amount of benefits.  As discussed above, some its acts were merely ministerial,

others were not.  It cannot be the case that in determining and then applying the

COB methodology—with the result of paying participants less than the amount to

which they are entitled under the plain reading of the Plan terms—UHIC was

acting merely ministerially.  Indeed, determining how much to pay is at the heart of

UHIC's fiduciary role.

31

C.    <u>Fifth Claim for Relief</u>

Plaintiff's Fifth Claim for Relief is against AB only.  As the Court has stated above, to the extent that plaintiff seeks injunctive relief with regard to this claim, no facts support such a claim.  Without any available relief, even a past violation of this provision leads nowhere.

Though it does not plead § 405, the Fifth Claim is plainly an unartful attempt to assert co-fiduciary liability.  The claim asserts that AB breached its fiduciary obligation to the Plan by failing to monitor, terminate, and replace UHIC as the Plan's Claim Administrator when it breached its obligations.  But even in the absence of pleading the correct section, plaintiff has failed to support her claim with the requisite statutory elements of knowledge, enabling, or failing to remedy.  <u>See</u> 29 U.S.C § 1105(a) [ERISA § 405(a)].

IV.    CONCLUSION

For the reasons set forth above, defendants' motions are DENIED as to the First Claim for Relief and GRANTED as to the Second, Third, Fourth, and Fifth Claims for Relief.  Plaintiff's motion pursuant to Rule 56 of the Federal Rules of Civil Procedure (ECF No. 133) is DENIED as moot in light of the Court's determinations.  The Clerk of Court is directed to terminate the motions at ECF Nos. 124, 127, and 133.

SO ORDERED:

Dated:        New York, New York
              November ⊥, 2014

              KATHERINE B. FORREST
              United States District Judge